Good morning, Justices, Counsel. My name is Jim Kelly. I'm here on behalf of the Appellant Employer. This is not to suggest that any of the Justices need a warm-up, but this is a good case to start with because I think it's a very simple case, a very straightforward issue, and frankly, a slam dunk. This is a case that the employer, one at arbitration and one at the commission level, it was two accidents, essentially a load fell on a truck driver and then he returned in April of 2006, then he returned back to work and had a brief exacerbation in October of 2006. In April of 2007, he went back to truck drive and worked home. Counsel, before you get into the facts of the case, can I ask you a question? Sure. In this particular case, the employer won before the commission, is that correct? That's correct. It wound up into the circuit court and the circuit court order reads, the decision of the Workers' Compensation Commission is contrary to the manifest weight of the evidence. Decision of the Workers' Compensation Commission is reversed. In this case, it's remanded to the Workers' Compensation Commission. Could you tell us what our jurisdiction is, please? Given that this case is similar to a number of other comp cases, that this was reversed and remanded on the issue of the sole issue, we view this as a final order that if in terms of if it is not appealed now, I mean, it could be appealed now because it addresses the sole issue in the case. What's the sole issue? The sole issue in this is whether the arbitrator was correct and the commission was correct in future medical treatment, any additional medical treatment. And if we went back to the arbitrator at this point, the commission, we would have to essentially authorize this treatment and go down the road of all this medical treatment before we would come back to see Does the commission have to do something other than a ministerial arithmetic calculation? Do they have to actually decide a fact issue? The way that I, this is, and I was going to get to the order. The way I read the order is basically the judge has ruled this to go back to the commission and that they authorized the medical treatment. That's not what he says. He says the decision of the U.N. Workers' Compensation Commission is reversed. Defendants shall pay medical bills to so-and-so, so-and-so, and so-and-so. The defendant shall provide reasonable and necessary medical care prescribed by Dr. so-and-so, and so-and-so. And the matter is remanded to the industrial commission pursuant to Scott versus the industrial commission. I think the author meant to say Thomas versus the industrial commission because that's the Thomas site. But it occurs to me that if that commission has to do anything other than simple arithmetic, we have no jurisdiction to hear this case. And that certainly takes precedence over any of the issues you raised. In terms of the... Let me ask, this is a 19B, right? It is. And did the judge's order resolve all of the issues that had been presented in the 19B hearing? It did. It did. And I guess what I'm getting at in terms of, I think this is a defective order by the circuit court, but I don't know any other way other than to go back down and Well, the circuit judge ordered the medical treatment. Correct. Correct. So I don't think there's anything else for the commission to do. I don't... Wait a minute. According to his order, they have to make a determination as to whether what the benefits are as a result of compression fractures at C4, C5, L3 as a result of a compression fracture. That's not ministerial arithmetic work. The two things that are ordered, Justice, are in paragraphs 2 and 3. And it says exactly what to do. Pay these bills and authorize this care by these two doctors. I don't know what else the commission would have to do other than either enter that order or... Well, it says here, the Workers' Compensation Commission states that the petitioner suffered compression fractures C4, C5, L3 vertebrae as a result of the accident. The medical evidence in the record from all the physicians, including the treatment physicians, proved that the work accidents were a factor in the condition of ill-being in the cervical and lumbar spines. The commission's conclusion does not support with any medical findings the plaintiff's work injuries were not a factor in plaintiff's need for further medical care or that such care was unrelated to the work accident. It is found to be otherwise compensable. There's fact issues that have to be decided here. Judge, I don't really understand this order. What you just read is really irrelevant because that isn't even an issue in the case. Wait a minute. The causal connection... I didn't write this order and I didn't sign this order. I'm not being critical of you, but what I'm the way the judge structured this order, he gives these three or four paragraphs that don't make any sense. And then he says, it is ordered. Here's what's ordered. And the two things he ordered are just strictly the commission can say, all right, you have to pay these bills for responding and you've got to authorize the treatment recommended by this lady and the other doctor. But these things that you're reading... He reversed the decision of the industrial commission. Once he did that, you have no decision, period. Judge, the problem with that language that you just read... Justice, excuse me. The problem with the language that you just read there, that isn't an issue even in the case. If you read the commission decision, causal connection was not an issue. Causal connection for the future medical care was an issue. Counsel, then somebody should have gone before this judge and said, you signed an order that was jabberwocky. And how about writing an order that relates to our case? Instead, he reversed the entire decision of the commission. Is that what he did? I think he ordered according... I agree with you on the order is the word that you used. I don't know if I can pronounce it again. Jabberwocky? Yeah. That's a legal term. But I will tell you that what we went through to get to this point was unbelievable. And this judge wanted to reform the work comp system. His whole issue with this case is that, and these first few paragraphs he talks about, was that he didn't like the way that the order was written, that it was a technical issue for him, the order. So he struggled to write any order because his concept didn't make sense. And if I get into my argument as to the whole case, there's just overwhelming evidence to support the commission's decision. Counsel, I'm not suggesting that at some point in time you won't have an opportunity to argue those things. The Supreme Court says you argue when the commission issues its decision on remand, and the very first thing we look to is the propriety of this order. And I understand all that. But if he says the decision of the Workers' Compensation Commission is reversed, there is no more decision. It's done. It's finished. It's gone. Well, I read this order that the things that were ordered are paragraphs that he's reversing are as to paragraphs 2 and 3. Because there aren't any other issues in the case. All TTD causation was not an issue. All medical was paid. These are the only two issues in the case. And so the commission, there's nothing else to do, to go back to your original question. And so if we go back and authorize this treatment after this person has surgeries or whatever, and then have to come and try to appeal this decision, to me this is a final order that says here's what you're to do, and this is the time to appeal it now for judicial economy, for the expense, the cost. And I believe you do have jurisdiction. I do believe the Supreme Court's order is faulty, but I don't know. We go back to the commission, we'd be standing in front of the commissioner, they'd be scratching their head. I'm not sure what we would be doing. Maybe we ought to send this back to the circuit court and tell them to draw an order that makes sense. Well, I would have no problem with that, but I would tell you that if it says that the commission's decision is reversed, I'll be standing in front of you another day, I will say that, because this was the most ludicrous decision I've ever seen in my life. While you're signaling into that, why don't you just briefly, succinctly tell us why the commission's decision was correct and the circuit court should be reversed. The way the judge wrote this order is that he did not believe that there were sufficient findings of fact by the commission. And then he indicated he did not believe that there was inferences drawn in the legal conclusions that support the legal conclusions. That's what, if you read his order, that's what his problem was with the commission's decision. So, when you look at this order, and I know you are all justices from all over the state and I've had the fortune to go from herein to Rockford throughout my 20 years of doing this, this is not a bad order in terms of, she spent 17 pages outlining the facts. And this, and it's not, it's not a recitation of the facts. Look, if you look at like, for example, she's saying here's what he said on cross-examination, here's what he said on direct, and this doesn't make sense because of X, Y, and Z. She's synthesizing all of these facts and doing a wonderful job of going through all the evidence. And if you go back and forth, back and forth, she's taking snippets of testimony from thousands of pages of deposition and juxtaposing cross-examination with direct examination. That's not a recitation of the facts. On page 8, you know, petitioner testified he continues to see Dr. Piska on a monthly basis for pain management treatment. She says, well, however, the medical bills offered in evidence, he wasn't seen for approximately four months between May 2009 and September 2009. That took some real analysis. That isn't just reciting regurgitating facts. She goes on, additionally, petitioner was only seen by Dr. Piska twice in the nine months prior to arbitration. Petitioner offered no explanation why he would receive pain medication from an anesthesiologist but not get the recommended injections. She's clearly, through her statement of facts, doing thorough analysis. And each one of these paragraphs, if you go through, she's doing that. And she's making comments on them, saying certain doctors did a thorough exam. On page 5, for instance, Dr. Shanker documented a detailed physical exam. He does great, the next paragraph, 24 pages in great detail. This is not somebody just saying, just going through and citing all the facts. She does 17 pages of synthesis to support her decision, and then she gets to the conclusion of law, and the judge says, well, wait a minute, now in the conclusions of law, she doesn't draw any inferences. Well, if you look at her conclusions of law, for instance, the facts to support them. Petitioner's medical records establish petitioner had a longstanding history of preexisting that condition. Petitioner's medical records establish he had a longstanding history of a back condition. Petitioner's records establish that he had a preexisting history of neck treatment, back treatment. He had an aggravation in these work accidents and was at treatment, was at MMI for his treatment and then had new aggravations. He only received conservative care. He was released to return to work with the same restrictions after this accident that he had before the accident. All right, counsel, let me ask you this question before I go through all of the facts. Is there any doctor, even the treating physicians for the claimant, who opined within a reasonable degree of medical certainty that the claimant's current condition of ill-being was related to either of the accidents? Did anybody ever say that? You know, my answer would be no. And if you look at the testimony, this is why I think the judge did a good job. One of the things, this guy withheld information from his doctor. The judge did a good job. First of all, you're talking about the arbitrator. The arbitrator did a good job. Excuse me. I apologize. You're not saying the judge. You're saying the applicant. I apologize. In the practical world, I apologize. We're calling arbitrators judges and that's my mistake. I'm talking about the arbitrator did a nice job. And the synthesis that I'm talking about was in this commission. Well, let's get aside whether or not anybody did a good job, judge, arbitrator. The issue is whether or not there is evidence in the record to support the commission's decision. Is it against the manifest way of the evidence? So that's what you've got to hone in on. Who did a good job is not to test on appeal. Correct. And the reason I'm citing these things were because these were things, forget about the 17 pages of facts to support a decision, which is a huge abundance of facts for an arbitrator to cite in support of one little single issue. The one issue is. Was the commission's decision against the manifest way of the evidence? Correct. But was it? I take it you have to be saying that it was not against the evidence. It was not. Clearly it was not. And why was it not? It was not because of all these things that we're talking about. This is a guy that returned back to work in April 2007 after his two work accidents, had no increased restrictions, working full duty, stopped getting medical treatment, has all of these credibility issues. The guy clearly was manipulating the system. He was withholding from his doctors that he had pre-existing conditions. He was withholding an arbitration. He had a 40 pound permanent weight restriction before he ever came to work for our employer. And it's disingenuous for them to say he had no treatment in the three years leading up to the accident. He wasn't working. He just had a major fusion. And he was trying to withhold that he had a 40 pound weight restriction. When he got done with these two exacerbations for our employer, he was returned back to full duty work with that same restriction, went back to work as a truck driver in 2007, and all the way up until the date of arbitration, had been working full duty and did not miss any time from work, was not receiving any medical treatment, and essentially was at an MMI for this. Well, basically, it's a simple case in the sense that the Commission said, look, yes, you're compensated for these two accidents, but your conditions have resolved. You're back where you were before you even showed up at the employer's place of business. That's exactly right. And that the circuit judge is making some argument that there's multiple inferences that could be made, and the Commission made the wrong inferences. That's correct. And that's why I think what Justice is saying about what's the standard, and the standard is, you know, the against the manifest weight standard. It isn't could we make some inference in support of the circuit court judge. The issue is, is there any basis in this record to support the decision that was rendered by the Commission? And clearly there is. And I'm not trying to waste your time. I list all these facts. But these facts that I pulled that I was listing... Let me just take it real easy. What did Cohen-Shanker say? Cohen-Shanker... Cohen-Shanker said that he could go back to his duty... Well, he defined that his injuries had completely resolved... Correct. ...by the first accident. Correct. What did his own doctors, Sweeney and Saleha, say about, in a reasonable degree of medical certainty, whether his current condition of ill-being was related to the... Well, this is why I hedged, because on direct examination they gave some of the boilerplate language, yes. But that's why the cross-examination was so critical in this case, because they admitted, yeah, the guy didn't tell me this. He didn't tell me I had a permanent weight restriction. You know, Sweeney didn't even come on board until this guy started working for a new employer. He said, boy, I didn't know about this past history. And so these guys, when I'm giving them this stuff on cross-examination, they're saying, yeah, Mr. Kelly, you're right. This guy, Saleha, he says all the way back to in the 1990s that if he's having these MRIs and EMGs, surely this was going to wax and wane. Surely he was going to have exacerbations. So my short answer is, no, they didn't give causation opinions, because at the very least it would be equivocal even if you gave them any credence to that on direct examination. But on cross-examination, I think it's clear from all of the testimony from all of the physicians that there was not a causal connection between his current condition of ill-being and the need for medical treatment. And I had a lawyer tell me once when I first started, if you're arguing about the standard, you've got a bad case. But I pulled a couple of Supreme Court cases, and I think I cited my brief. But this is, I think, Brady says... Counsel, your time goes fast. It's... It just essentially says that if the record contains any evidence supporting the Commission's decision, we must sustain. Your time, Your Honor. Very good. Thank you. Counsel? You may respond. If it pleases the Court, Mr. Kelly, my name is Jim Kenney. I represent David Parra in this workers' compensation case. And I, too, had grappled with the issue of whether or not this was properly here at this point in time, whether or not jurisdiction had properly been infested. I'm going to say... So what is your conclusion on that? I thought that it was supposed to go back to the Commission for the Commission to make some additional decision. But we're here. I mean, the Circuit Court had made some specific directions to the Workers' Compensation Commission to consider. The problem... You grappled with it. You thought it should go back, and you didn't say it. It's true. I didn't... I mean, I could have brought a motion. Yes. I could have. And... You didn't ask to conclude if there is jurisdiction. Well, I'm going to defer to what this panel decides in terms of jurisdiction. I'm not smart enough to... Let me ask you another question. Is there still disputed TTD? In other words, did you get all the TTD you thought you should have been entitled to from the arbitrator? Yeah, we did. We did. Okay. And what we did not get was the medical expenses that we submitted... And future medical. Right. And the judge ordered that. That's true. And so, again, my question is, what is there left for the Commission to do on this 19B? The Commission has to do several things. First and foremost, they have to enforce whatever this order is. They have to require that the respondent pay the outstanding medical bills as they exist presently. The ones that the circuit judge ordered. Right. And that were actually submitted in tabinets at the time of the arbitration hearing. Okay? And there was a basis for the award of those benefits. You're talking about enforcement, but what is there left to decide that was presented at the arbitration hearing on the 19B? Well, as the 19B is written, permanency issues have not yet been decided. I understand you've got to go back and have another hearing for permanency, but what was presented at the time of the 19B hearing, is there any issue out there that hasn't been decided by the circuit court? I believe so, because Dr. Slahey had made some recommendations in terms of a directed course of treatment that needs to be followed. And that has not been acted on. What about Dr. Sweeney's? Dr. Sweeney had recommended that if he, David Parra, were still his patient, he probably would have opined that he needed to have surgery at the C5, C6 level where we had compression fractures and some type of a spondylolisthesis. So he found that there was spinal instability at those levels. The circuit judge ordered defendants shall provide reasonable and necessary medical care prescribed by Dr. Slahey and Dr. Sweeney. Right. And that hasn't happened. They ordered to do it, though, so is there anything for the commission to do that has to be done? I suppose that it's not. I know that one of the problems that Judge Sapero had with this decision was the Workers' Compensation Commission in their conclusions of law made specific findings about what my client's injuries were. What we have to understand is that on April 26th, David's pulling off a strap and a load of balconies falls directly on top of his head. It's sufficient force to cause compression fracture at L3, compression fracture at C5, compression fracture at C6. And there is a ton of evidence that was alluded to by Mr. Kelly with regard to prior and preexisting conditions. But the record is absolutely silent on there being any medical care for three years with regard to the neck prior to the April 26, 2006 accident. So from my perspective, the decision of the Illinois Workers' Compensation Commission is, it's not, it's not, it's against the manifest way of the evidence, but it's also contrary to law. Because what the commission has refused to do and has failed to do is that they refused to consider the preexisting condition that my client had that was then worsened and aggravated by this accident. Now you're raising the theory that obviously aggravation of a preexisting condition is compensable, the injury doesn't have to be the sole cause that can be a factor. That's true. Did you proceed on that argument? Absolutely. That was my theory throughout the whole case. And as a matter of fact, Dr. Sweeney in his evidence deposition testified that this accident aggravated a preexisting condition. Counsel had alluded to some of that in his last examination with regard to, like, for instance, Sweeney was asked whether or not the degenerative condition that existed in the back prior to April of 2006, you know, what was the cause of that. He said, well, it's a degenerative condition. It's something that occurs naturally. But he did say that based upon his review of the MRI studies, there was a condition that was never present in any of the prior radiographic studies. Are you referring to the treating physicians? You also have Drs. Cole and Shanker clearly testifying that the claimant's lumbar injuries are completely resolved following the first accident. And the second accident only involved minor soft tissue injury. So tell us why the commission couldn't have relied on them and rejected the opinions of Sweeney and Szilagyi. How was that against the claimant?  following the first accident. And the second accident only involved minor soft tissue injury. How was that against the claimant? Well... Don't they decide the weight to be given to the medical evidence? Do they have to pick the treating physicians? Absolutely. No, they don't have to treat the physicians. But what's unusual about this case that would, you know, compel us to reverse the commission? Well, what's interesting about this and what really compels this panel, I think, to do what Judge Shapiro did, is the fact that we have an identifiable violent injury that caused instability to the spine and which is documented by the C5, C6 compression fractures. And it's at that level that both Dr. Szilagyi and Dr. Sweeney said was unstable and required additional care. Dr. Koh doesn't consider that at all. Dr. Shanker doesn't consider that. Not only that, but Dr. Koh is a physiatrist and I'm not trying to, you know, downgrade what his skill level is, but he's not a surgeon. He's a physiatrist. Okay? Dr. Shanker is a neurologist. What's interesting is that prior to the visit with Dr. Shanker, Dr. Sweeney had recommended and prescribed an EMG of the cervical spine. Respondent sends him, sends David Parra over to see Dr. Shanker, who's a neurologist. Does he do an EMG? Not at all. David Parra had to go in the pocket, go to a doctor named Dr. Sargent to have the EMG done, which demonstrated that there was reticulopathy in the cervical spine. That was a basis. Not the only basis, but that was a basis. My problem here is that I look at what the Workers' Compensation Commission did. They're saying that David Parra's a liar. Okay? Because he didn't devote certain information on his employment application. They can do that, right? Absolutely they can do it. And they'll tell you it's a DOT license. Okay, but if you look at it, this accident didn't happen because David was lifting up something that was too heavy, that was beyond his restrictions. What happened was that he had a compression fracture at the L5, L3, C5, C6 levels when a load of metal fell on his head. That had nothing to do with what his work restrictions were at that time. In fact, the evidence that was presented at trial demonstrated that from the time that David started working for Jack's Specialized Services, he worked every single day. Michelle Bradish, who was the president of the company, was their president at the hearing. She was never called as a rebuttal witness. She didn't rebut or refute anything that was said by David Parra in terms of what work he was able to do for the company. You know, what I thought was this was kind of character assassination bringing up the fact that David had prior workers' compensation cases. That's what this case was all about. Well, let me just say, what do you make of the statement by your claimant's treating physician Sweeney, Sweeney's opine that he would have expected the claimant to have experienced cervical and neck pain shortly after the April 26th accident rather than a month later? Isn't that sort of damaging to your case? Yeah, I suppose that it is. But when you look at what the factual basis is at the time of these complaints, David had the compression fractures in the C5, C6, L3. He also had multiple rib fractures. Okay? I've had rib fractures. Okay? The only thing that is hard about having a rib fracture is the breathing in and out all the time. And you feel that all the time. So Sweeney testified in his deposition that that could have masked some of what he had been experiencing in terms of his cervical spine. A month later and he still doesn't have any symptoms or pain? That's not the way that I look at it. Dr. Freeman reported that he was treating him for his neck. And there were x-rays that were taken of his cervical spine at the hospital on the date of the accident. So somebody had not noticed and knowledge that there was a cervical spine issue as of the date of the accident. I mean, David was extricated from this wreckage by a crew of firemen from the Oak Forest Fire Department. I don't think there's any questions sustained in you. So I take it in essence your argument looked as if there is a battle of the experts, but you're saying the opinions of Sweeney and Salahi really addressed the root issues here and the other doctors really didn't get to that. Therefore, Salahi and Sweeney should carry the day. Absolutely. Okay. Your time is up. Thank you. Thank you. Just briefly on the jurisdictional issue. Number one, I would like to point to my opponent's brief in the statement of jurisdiction in which he says the court has jurisdiction over this appeal, which covers final judgments of the circuit court and civil cases in his jurisdictional statement. I understand he might be backing away from his intelligence level today in jest, obviously, but he's admitted that. He's still grappling with the issue. Okay. And we are too. And then to answer the second component of that, Justice, you asked the question, and that is, was there anything left substantively for the commission to do on a 19B? And I wrote down Mr. Kenney's response, and there is not. So that, to me, is the end of the jurisdictional issue. Okay. What about his argument? I've been asked to his argument. This is what I was talking about early on in this jurisdictional question about the fact that the issue of causation has, the arbitrator found an aggravation. So this whole nonsense about they didn't give my client credence for an aggravation, that's what arbitrator Hagen found, an aggravation. If you read her order, she says the medical records establish the petitioner has a longstanding history of preexisting neck and back conditions and treatment. The medical records confirm the petitioner suffered aggravations and two injuries, the two work accidents that reached maximum medical improvement. So what she found is, yes, aggravations in the two work accidents. That's been decided. It's not on appeal. It's not disputed. The issue is, was it MMI, which she says, yes. Correct. Exactly right. So all that talk about those issues is just absolutely moot. And the thing about the credibility is this. It came down to these current symptoms today at the time of arbitration. That's why his credibility was an issue. Because we've got a guy that's got to explain, am I back to my pre-injury state? Am I back to that or not? And he's trying to lie and say, no, I'm not. I have this restriction now, but we've got to get out of him. I've got to drag out of him in cross-examination that he actually pull a record out and say, you had this exact same restriction before you even went to our employer. So she picked up on the fact that he was trying to manipulate the credibility. Not, oh, they didn't take into account his pre-existing. That's where the liar part came in. And this notion, and I alluded to this before, this notion that he worked for five months. Keep in mind, this is how bad his condition was. He was off for three years before coming to our employer for these very same issues, neck and back. Off three years. So it's disingenuous to say he had no problems working. He wasn't working. Then he worked five months for our employer. Now, think about that for a second. Before, he suffered two work accidents. Then he goes back to work in April 2007, and from April 2007 until the present day, he's working full duty as a truck driver. So, I mean, to me, has he returned back to his pre-injury state? Those are the things that, why the arbitrator was looking at his credibility about saying he needs treatment because of these two exacerbations, when the medical is just, the testimony from the doctors is great about these issues. Waxing and waning. Pre-existing. Long-standing. He'd have these exacerbations. So the evidence is overwhelming in that regard. Wait a second. What medical care was prescribed by Shillay and Sweeney? What did they say he needed? Nobody has recommended surgery, but Shillay, he recommended injections, and this is a very good point that I've left out, and that is, these injections that he recommended were the exact same injections that were recommended before he ever came to work for us, and he had not had them. Did he recommend anything else after the appointment? Conservative. Just conservative care. The same type of, and I think I pointed this out throughout the cross, the same type of conservative care he had had to treat these injuries before coming to work for our employer. EMGs for diagnosis. What did Sweeney recommend? What did he say he needed? Yes, Sweeney gave some conservative care, but the typical, if that fails, may need surgery. That was his explanation. Who is to decide whether you have to pay for surgery? I mean, I think it's been ordered that we have to pay for it. If Sweeney, and that's the problem, this is how it works in the practical world, he sends it back to Sweeney, and Sweeney says, okay, we're going to do an injection, and if that fails, we're going to do surgery. I've got to pay for that. And that's why the time is now to make a decision on this. Otherwise, I'm on the hook. We're going to be a subject of penalty. It says here the defendant shall provide reasonable and necessary medical care prescribed by Chalet and Sweeney. What was it that was prescribed by Chalet and Sweeney that was reasonable and necessary? And who makes that decision? Injections and conservative care. And if conservative care fails, surgery. And what about Sweeney, what did he say? Sweeney was injections. Sweeney was conservative care if that fails, surgery. And the doctor, the medical doctor is going to make that determination. I mean, I can't. I can't. I mean, I guess if I did, we'd get an ITB, and then we'd pull out this order, and I would, you know, I would be subject to penalties. You know, the way this order is written. It tells us we have to pay that treatment recommended by these two doctors. Thank you, counsel. Thank you. This matter will be taken under advisement and written